THE RUEMMELI-BRAUN COMPANY V. JAMES W. CAHILL.

(Filed September 3, 1904.)

1. **PERSONAL INJURY—Fellow Servant—Vice-Principal.** In order to constitute a manager or superintendent of a manufacturing plant a vice-principal, for whose negligence in the management thereof the master will be liable for personal injury to any of those employed under him and who are subject to his direction and control, the master must confer upon such manager or superintendent the entire and absolute management of the entire business, or of an entire department thereof. retaining no oversight and exercising no discretion of his own as to the conduct of such business, except that it is the positive duty of the master to use reasonable care in providing safe tools. machinery and appliances to work with; a safe place to work in, safe material to work on and safe fellow servants or co-employes; and, if the business is such as to require it, to provide safe and proper rules and regulations for the conducting of the same. Negligence in the performance of any of these positive duties will render the master liable without regard to the standing or authority of the employe through whose fault the injury is occasioned. If the injury is not the result of an omission to perform one of these positive duties of the master, but is occasioned by the negligence of one in charge of the manufacturing part of the plant, such an one will be deemed a fellow servant with the person injured, even though he has

power to employ and discharge hands, and to oversee the men, and direct the work, unless his authority in his department is entire and absolute. If he is subject to the control of one over him in the management of his department, he is a fellow servant with those under him.

2. EVIDENCE—Not Sufficient to Sustain Verdict—Practice. If, from an examination of the whole record, it clearly appears that the evidence does not reasonably support the verdict, and that a new trial will not change the result, this court will reverse the judgment of the court below, and remand the case with direction to enter judgment for the adverse party.

(Syllabus by the Court.)

*Error from the District Court of Logan County; before Jno. H. Burford, Trial Judge.*

*Dale & Bierer* and *Henry E. Asp,* for plaintiff in error.

*Lawrence & Huston* and *Joseph Wisby,* for defendant in error.

Opinion of the court by

Burwell, J.:  James W. Cahill was employed by the Reummeli-Braun Company in its ice plant as an oiler and wiper, and to do generally whatever he might be ordered to do by the chief engineer. While so employed he was directed to make a certain steam pipe connection in the engine room, at a point some sixteen feet above the floor, and for this purpose he got a ladder, and he and the chief engineer placed it in position. He ascended the ladder and began making the connection. After he had worked a short time, he says the ladder slipped a little, and the chief engineer, who was standing at the bottom of the ladder, placed his foot against it, which rendered Cahill's position safe, and he then resumed his work. The engineer, without notice to Cahill, walked away, and the ladder fell, inflicting injury

to Cahill, for which he recovered judgment in the court below, in the sum of $3,000, under the theory that the chief engineer, Mr. Lindeman, was, at the time of the accident, a vice-principal.

We have read the record and the authorities cited, and are of the opinion that, under the facts and the law, the judgment should have been for the defendant company. The contention of the appellee that Lindeman was the manager of the company is not borne out by the evidence. On the contrary, it establishes that Mr. Braun was the manager and that Lindeman was nothing more than a foreman under him and subject to his direction and control. Lindeman had no management or control of the business except as directed by Braun. It is true that Lindeman, in the absence of Braun, looked after the hands and directed matters generally about the plant, the same as any foreman would be required to do. He also had the right, perhaps, to employ and discharge hands; yet this is a disputed question of fact. But authority to do these things does not necessarily make him a vice-principal within the law. (*Martin v. A. T. & S. F. R. R. Co.,* 166 U. S. 399.) It is true that the appellant is a corporation, and can operate its business only through agents; and that the law recognizes one who is placed in complete control of an entire business or an entire department of a business, as a vice-principal, and when he is guilty of negligence in the exercise of his duties, whereby an employe is injured, his master, in certain circumstances, will be held liable even though the act is not a failure to observe what is known as one of the positive duties of the master to his employes. It is the positive duty of the master

to use reasonable care and diligence in providing a safe place in which to work, safe tools, machinery and appliances to work with, safe materials to work on, and in selecting safe fellow servants or co-employes and, if the business is such as to require it, to promulgate safe rules and regulations. These are the positive duties of the master, which cannot be delegated so as to escape liability for a failure to observe them. But none of these duties were omitted in this case. If Lindeman was a fellow servant (which we will consider later) and was guilty of negligence, the plaintiff has neither pleaded or proved that the master did not use reasonable care and diligence in employing him, and the contention of appellee that he was not furnished a safe place in which to work is without merit. The making of steam pipe connections was within the scope of his employment, but even if it were not, if when ordered to do the work he proceeded to do it with knowledge of the surrounding conditions, he assumed all of the risk incident thereto. It is true that the place where Cahill was doing the work was not absolutely safe, because the ladder fell and he was hurt; neither is one who is engaged in painting a church steeple, or the upper stories of a high building from a swinging scaffold working in a safe place; but if there are no hidden or unusual dangers, the workman has a safe place within the meaning of the law, and the dangers in such case are only those which he contracted to assume. (*Martin v. A. T. & S. F. R. R., supra.*) The place where Cahill was working was rendered unsafe only because of the negligent use, by ordinary fellow servants, of safe appliances furnished by the master. This did not constitute an unsafe place under the

law. If the appellee were entitled to recover at all, it would be by reason of the conduct of Lindeman in walking away from the ladder, and even then the court would have to find that Lindeman was a vice-principal, for it will not be contended that Cahill can recover for the negligence of a fellow servant, and, as indicated before, Lindeman was a fellow servant of Cahill's. Under all of the evidence, he worked about the ice plant the same as other employes. He labored with them, doing whatever was necessary to be done, (but principally in running the engine) and when Cahill and Lindeman undertook the work in question, each assumed the risk of working with an ordinary fellow servant, and the relation was not different because of the fact that Lindeman was Cahill's superior in rank of employment and authority. Mr. Justice Brown, in the case of *Northern Pacific Railroad v. Hambly,* 154 U. S. 349, said:

"In a large majority of cases there is some distinction either in respect to grade of service, or in the nature of their employment. Courts however have been reluctant to recognize these distinctions, unless the superiority of the person causing the injury was such as to put him rather in the category of principal than of agent, as, for example, the superintendent of a factory or a railway, and the employments were so far different that, although paid by the same master, the two servants were brought no further into contact with each other than as if they had been employed by different principals."

The case of *Baltimore & O. R. R. Co. v. Baugh,* 149 U. S. 368, is also in point. Justice Brewer says:

"And this rule is one frequently recognized. Indeed, where the master is a corporation, there can be no negligence on the part of the master except it also be that of some

agent or servant, for a corporation only acts through agents. The directors are the managing agents; their negligence must be adjudged the negligence of the corporation, although they are simply agents. So when they place the entire management of the corporation in the hands of a general superintendent, such general superintendent, though himself only an agent, is almost universally recognized as the representative of the corporation, the master, and his negligence as that of the master. And it is only carrying the same principle a little further and with reasonable application, when it is held that, if the business of the master and employer becomes so vast and diversified that it naturally separates itself into departments of service, the individuals placed by him in charge of those separate branches and departments of service, and given entire and absolute control therein, are properly to be considered with respect to employes under them, vice-principals, representatives of the master, as fully and as completely as if the entire business of the master was by him placed under charge of one superintendent. It was this proposition which the court applied in the *Ross case,* holding that the conductor of a train has the control and management of a distinct department. But this rule can only be fairly applied when the different branches or departments of service are in and of themselves separate and distinct. Thus, between the law department of a railway corporation and the operating department, there is a natural and distinct separation, one which makes the two departments like two independent kinds of business, in which the one employer and master is engaged. So, oftentimes there is in the affairs of such corporation what may be called a manufacturing or repair department, and another strictly operating department; these two departments are, in their relations to each other, as distinct and separate as though the work of each was carried on by a separate corporation. And from this natural separation flows the rule that

he who is placed in charge of such separate branch of the service, who alone superintends and has control of it, is as to it in the place of the master."

In reading this case, however, we should not overlook the rule positively laid down by Justice Brewer, that to bind the master for the acts of the superintendent, such superintendent must not only have control of the entire business or entire department, but this control and management which he exercises must be entire and absolute. The same rule is stated by the United States circuit court of appeals for the eighth circuit, in the case of *City of Minneapolis v. Lundin,* 58 Fed. 525, in which Judge Sanborn says:

"A vice-principal is the representative of the master, and for his acts and negligence the master is responsible. An employe of a corporation may become such a representative in two ways: First, he may be entrusted with the entire management· and supervision of all the business of the corporation, or with the entire management and supervision of a distinct and separate department of its business, and in such a case he may be termed a general vice-principal, because in all of his acts relative to the business of the corporation he stands in the place of the master, and the latter is liable for his negligence in their performance."

And then it is further said in the opinion that any employe may be called a special vice-principal without regard to rank, when performing one of the positive personal duties of the master. But it may be said in this case that as to whether or not Lindeman was in the entire control and management of the business is a disputed question of fact which the jury determined in favor of the appellee. It is true that the jury found for the plaintiff in the court below, but that it was justified in doing so under the evidence

or the law, we deny. The evidence on this point in substance was as follows: Cahill testified that: "Lindeman looked after the freezing of the ice and looked after the entire manufacturing establishment, including the engine room, the boiler room, the ice tanks and the condensers; that he looked after and directed the movements and duties of the men, and that Lindeman employed and discharged hands."

C. F. Cunningham, a witness for the plaintiff, testified that Mr. Lindeman "had charge, under Mr. Braun, of running the plant;" that Mr. Lindeman had control of all of the men and worked with them, and did as much hard work as any of them. With the exception of further testimony to the effect that Lindeman employed and discharged men, the foregoing is, in substance, all of the evidence of the plaintiff tending to show the authority of Lindeman.

After the plaintiff had rested his case, the defendant introduced its evidence. Lindeman testified that Mr. Braun was the general manager of the entire plant and business, and in answer to the question, "Do you have any control or charge of the management of that plant?" he answered, "I have it under the management of Mr. Braun, whatever he tells me I (will) have to go and do it." He further testified that he worked right along with the men; that Mr. Braun had authority to tell him what to do, and that whatever Braun said for him to do he was compelled to do it, no matter what it was; that Braun came in the part where he worked quite often—sometimes three or four times a day, to see that everything went on and was running all right; and that they kept things in order; that sometimes

when Braun would see something that ought to be done, he would go to him and tell him to do it, or ask him why it had not been done, and if not done because of lack of help, Braun would direct that men be hired; that he worked on a salary for $85.00 per month; that he had to go by Braun's orders; that ordinarily, every day, Braun had full charge of the men and the work in the engine room and the ice manufacturing establishment; that before making a big trip Braun would call him into the office or go into the engine room and tell him how to take care of everything and how to get along; that when Mr. Braun was out of town he was in full charge of his own department; that Braun looked after other ice plants of the company; that he discharged hands under the direction of Braun; and that Johnson, the head bookkeeper, had general superintendency and charge of the entire plant when Braun was out of town.

Mr. Braun testified that he was secretary and manager of the company; that he gave his personal supervision and attention to the management of the plant in question; that when in town he made daily rounds, sometimes over all of the plant and sometimes over only part of it, and required the engineer to report every morning how much ice had been pulled, how much coal used and how much supplies on hand; that the second engineer and fireman had to be employed by him, but if he were out of town Lindeman had authority to make such changes as were deemed necessary, and when he returned home the change had to be reported to him, as he attended to the filling of those offices himself; that in his absence Mr. Johnson had authority to

run the business and in emergency cases make changes and .alterations if they should be deemed necessary; that he was out of town when the accident in question occurred; that Lindeman was his overseer over the plant and that, in his .absence the plant was run under the chief engineer's supervision, direction and control, and that, should it become necessary to employ a night engineer in his absence, the chief engineer would have to consult Johnson, and whatever the two concluded was best for the time would be done.

In the case now under consideration, Lindeman did not have entire and absolute authority to manage the business or any department thereof. When Braun was there, Lindeman followed out and executed the orders and directions given by him. When Braun was about to leave the city he would call Lindeman in and instruct him as to the management of the business during his absence; and one who is subject to the control of a superior in the same department is not a superintendent in such department within the purview of the law, so as to make him a vice-principal. A superintendent is one who has the oversight and charge of something with the power of direction, and the supreme court of the United States has said that before the master can be bound this power of discretion must be entire and absolute. If his authority is less than this he is a fellow servant.

In the case of *Northern Pacific Railroad Co. v. Peterson,* 162 U. S. 346, it was held that the foreman of an extra gang of laborers working over three sections of road, who had the authority to employ and discharge men and to direct the work and movements of the men, was a fellow servant with those working under him. See also *Alaska*

*Mining Co. v. Whelan,* 168 U. S. 86, and *Martin v. A. T. & S. F. R. R. Co.,* 166 U. S. 399, wherein it was held that a section foreman and a conductor of a train are fellow servants with a section hand.   To the same effect is *New England Co. v. Conroy,* 175 U. S. 323, in which Justice Shiras reviews the decisions of the different courts.   One of the leading cases on this question is *O'Brien v. American Dredging Co.,* 53 N. J. Law 291-7.   In this case the dredging company was operating a dredge on the James River near Richmond.   One Cannon, who was called "Captain" of the dredge, was authorized to employ men to work on it, subject to the approval of the general superintendent, who had power to discharge them.   It was the duty of the captain to operate the dredge in such dredging.   The plaintiff, O'Brien, was employed by Cannon as a "deck hand" on the dredge, and his duty was to aid in operating the dredge. Cannon had charge of the men employed on the dredge and they were all under him.   The machinery had stopped and Cannon ordered O'Brien to take a position which exposed him to danger if the machinery moved.   Cannon then started the machinery, which resulted in the injury of O'Brien, who recovered judgment therefor.   On appeal, the supreme court reversed the lower court and ordered a non-suit.   It was held below that the captain of the dredge was a vice-principal and that the company was therefore liable, but the supreme court held that he, not being in absolute and complete control of the business, was simply a fellow servant, saying:

"This proposition accords with that one announced by the text writers on this subject, viz:   That when a master

commits the entire charge of his business to another, retaining no oversight and exercising no discretion of his own, the latter becomes, in respect to the duties of the master to the workmen in his employ, an *alter ego* or vice-principal of the master, who is liable for his negligence." Citing: Shear & R. Neg., sec. 102; 2 Thomp. Neg. note 1028, sec. 34; Whart. on Neg. sec. 229.

In the case just referred to the company was operating a number of dredges and the captain, Cannon, was in charge of one of them, and had complete charge of the men under him and directed the work. Simply because there was a man over him who could approve or discharge the hands which he employed and exercise a supervisory power over him, it was held that he was not a vice-principal, but a fellow servant. This case, so far as the facts are concerned, is certainly as strong for the plaintiff as the one at bar. The dredging company was operating a number of dredges. The ice company was operating a number of ice plants. One Albertson, was the superintendent of the dredging company and Cannon the captain was subject to his direction. Braun was superintendent of the ice plant, and Lindeman was under his absolute control and was required to consult him as to the management of the business. Both Cannon and Lindeman were mere foremen and therefore fellow servants, because the master in neither case had withdrawn its oversight and the exercise of its discretion over the business and conferred the entire and absolute management thereof on such person. In the dredging case, the superintendent, so far as the record discloses, never went about the dredges, while in the case at bar, Braun was about the business and the department wherein Lindeman worked several times

daily whenever he was in town. And Lindeman, being a fellow servant with Cahill, the latter cannot complain of any negligence of Lindeman whereby he was injured. He contemplated those contingencies when· he accepted employment. This question is commented upon by the supreme court of the United States in the case of *Central Railroad Company v. Keegan,* 160 U. S. 259, in which the dredging case from New Jersey is cited, with approval, quoting the following language:

"Whether the master retain the ·superintendence and management of his business, or withdraw himself from it and devolve it on a vice-principal or representative, it is quite apparent that, although the master or his representative may devise the plans, engage the workmen, provide the machinery and tools, and direct the performance of work, neither can, as a general rule, be continually present at the execution of all such work. It is the necessary consequence ˙that the mere execution of the planned work must be entrusted to workmen, and, where necessary, to groups or gangs of workmen, and in such case that one should be selected as the leader, boss, or foreman to see to the execution of such work. This sort of superiority of service is so essential and so universal that every workman, in entering upon a contract of service, must contemplate its being made use of in a proper case. He therefore makes his contract of service in contemplation of the risk of injury from the negligence of a boss or foreman, as well as from the negligence of another fellow workman. The foreman or superior servant stands to him, in that respect, in the precise position of his other fellow servants."

A large number of cases have been cited by the appellant in which it is held that authority to employ and discharge hands, or to oversee and direct the employes as to their

work, does not make such an one a vice-principal; but such cases only decide who are not vice-principals, many of them avoiding a declaration as to what authority is necessary to be conferred by the master to bind him for the acts of one, as such. From the authorities, however, the rule is firmly established that one may become a vice-principal only in one of the following cases: First, while he is engaged in performing one of the positive duties of the master, such as providing safe tools to work with, a safe place to work in etc., as heretofore stated, or if he is placed in the absolute control and management of an entire business or of an entire department, he stands in the place of the master and for his negligent acts, as such superintendent or manager, if they result in injury to an employe under him, the master is liable; and in this case the burden was upon Cahill to establish that Lindeman was clothed with absolute authority of management, and in the absence of proof establishing that fact, it is presumed that all engaged in the common employment of the same master, though different in rank, are fellow servants.

Other questions are argued, but it is not necessary to pass upon them, because the facts do not justify the judgment. Lindeman not being a vice-princpial under the rule stated, the judgment of the lower court is hereby reversed, at the cost of the appellee and the case remanded with direction to the lower court to enter judgment for the appellant.

Burford, C. J., who presided in the court below, not sitting; Irwin, J., dissenting; all the other Justices concurring.

By GILLETTE, J.: The judgment in this case does not meet with my views of what the law ought to be, but after a full examination of the decisions of the supreme court of the United States, I am satisfied that the rule laid down in the majority opinion of this court follows the rule as announced by that court, and I therefore concur in the judgment herein, thereby recognizing the rule so often stated that the decisions of the supreme court of the United States will be treated as controlling upon this court.

PANCOAST, J.: I concur in this decision and judgment only because I feel bound to do so for the reason stated by Mr. Justice Gillette.